IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KELVIN L. JONES,

  **Plaintiff,**

  v.

NATHAN J. BOECKMAN, et al.,

  **Defendants.**

Case No. 2:19-cv-04076-HLT-KGG

## MEMORANDUM AND ORDER

This is a civil rights action under 42 U.S.C. § 1983 stemming from an altercation that occurred outside a bar in Manhattan, Kansas. Plaintiff Kelvin Jones principally claims Defendants Sergeant Nathan Boeckman, Sergeant Scott Hagemeister, Corporal Michael Dunn, Officer Steven McDiffett, and Officer Jarrod Sheldon subjected him to malicious prosecution and excessive force. He also asserts a negligent supervision claim against Hagemeister and Boeckman.

Defendants move for summary judgment. Doc. 39. They contend that qualified immunity shields them from Plaintiff's malicious prosecution and excessive force claims. Hagemeister and Boeckman additionally argue that Plaintiff's negligent supervision claim fails as a matter of law. The Court agrees with Defendants and grants the motion.

## I. BACKGROUND[1]

Plaintiff was in Manhattan, Kansas on June 2-3, 2018, for his 20-year high school reunion. The events giving rise to Plaintiff's claims occurred in Aggieville, an entertainment district next

---

[1] Most of the events discussed herein were recorded on video by Defendants' body cameras. While a court considering a summary judgment motion based upon qualified immunity usually must adopt the plaintiff's version of the facts, that is not true to the extent that there is clear contrary video evidence of the incident at issue. *See, e.g.*, *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010). In those situations, the court relies on the video evidence, while acknowledging that it does not capture everything. Thus, in addition to relying on the video, the Court views the evidence in the light most favorable to Plaintiff as the nonmoving party.

to the Kansas State University campus. Plaintiff began his night by drinking a couple of beers in his hotel room. From the hotel, Plaintiff went to Tate's (a bar) in Aggieville. Tate's is immediately east of the Riley County Police Department Aggieville Substation. Plaintiff left Tate's and went to another bar, Kite's, where he drank a couple of beers. Plaintiff returned to Tate's where he had another beer and a shot. At this point, Plaintiff had consumed six alcoholic drinks—five beers and a shot.

Plaintiff recalls dancing at the top of the ramp near the entrance of Tate's when he was pushed from behind by a bouncer, causing him to fall to the ground. The bouncer screamed at Plaintiff, telling him he needed to get out. Plaintiff got up to his knees but was pushed down to the ground again by the bouncer. Plaintiff again got back up to his knees but was pushed down to the ground by the bouncer once more, causing Plaintiff's hat to fly off his head. After Plaintiff was helped to his feet, the bouncer screamed at Plaintiff again and told him "you need to get out" and/or "you need to leave." Plaintiff knew the command to leave was directed to him. Plaintiff turned around to leave and he was "pushed and prodded" until his brother grabbed Plaintiff from the front and walked Plaintiff toward the exit.

Sheldon[2] was on foot patrol in Aggieville at this time. While he was walking by the open door at Tate's, he looked in and saw the commotion. He first saw Plaintiff on all fours on the ground with several people in the general vicinity, with lots of yelling going on. The bouncer was repeatedly yelling "get out," and some women around Plaintiff were telling him to "get up" and "let's go." Sheldon assumed Plaintiff was on the ground because of a fight. Sheldon radioed-in the matter as a fight to assure a quick response by other officers.

---

[2] Sheldon's observations were not recorded because Sheldon failed to activate his body camera until Plaintiff was already handcuffed.

Sheldon stepped to the side of the entry, thinking Plaintiff and the group of people around him were going to leave. Sheldon then bent over and picked up Plaintiff's hat. McDiffett approached Tate's from the east and observed Sheldon at the front entryway appearing to converse with Plaintiff and his group. Instead of exiting, Plaintiff retreated further into Tate's. Sheldon dropped the hat to empty his hands and reached for his pepper spray in anticipation of having to address a threat. Sheldon then walked into the bar. McDiffett observed a struggle in the doorway and he approached the bar.

Sheldon walked past Plaintiff and got between Plaintiff and the bouncer. He threatened to spray Plaintiff with pepper if he did not leave. Plaintiff's brother came around Sheldon and bear-hugged Plaintiff and started to force Plaintiff towards the exit again. McDiffett observed Plaintiff struggling with some people who were trying to get him out of the bar and heard the bouncer yelling repeatedly for Plaintiff to get out. McDiffett grabbed Plaintiff's arm, attempting to bring him under control. McDiffett identified himself as a police officer and told Plaintiff to put his arms behind his back and stop resisting. At the same time, Sheldon turned his attention to the bouncer and asked: "what happened" and "what's going on?" The bouncer just kept yelling, "he needs to get out," and "he needs to get the 'F' out." The bouncer did not answer Sheldon's question.

Boeckman and Dunn arrived while McDiffett was attempting to get Plaintiff's arm behind his back. They observed Plaintiff struggling with McDiffett and apparently trying to get back into the threshold of Tate's. The struggle caused Plaintiff and McDiffett to move back into Tate's, which caused Boeckman concern for McDiffett's safety. Boeckman testified that Plaintiff was "obviously agitated," acting in an "aggressive manner," "causing a scene," and "any reasonable person would believe that he's trying to start a fight." Dunn identified himself as a police officer and instructed Plaintiff to stop fighting and put his hands behind his back. Dunn threatened to

3

deploy the taser if Plaintiff did not put his hands behind his back. Boeckman and Dunn each grabbed one of Plaintiff's arms and attempted to gain control of Plaintiff. Boeckman and Dunn gave multiple commands for Plaintiff to put his arms behind his back; Plaintiff refused these commands.

Boeckman forced Plaintiff's right hand up behind his back, applying a bent arm bar as leverage, which caused Plaintiff's arm behind his back to bend in an L-shape. Dunn had his pepper spray in his left hand and was using his right hand to hold onto Plaintiff's left arm trying to get it behind Plaintiff's body. Dunn again threatened to deploy the taser if Plaintiff did not put his arm behind his back. As Boeckman was applying the arm bar, Plaintiff fell and Boeckman "just went with him." Plaintiff struck a metal rail, causing a concussion and a laceration to Plaintiff's right eyebrow.[3] On the ground, Boeckman placed his fist in Plaintiff's upper back area and held Plaintiff's right hand between his shoulder blades. Dunn held his taser to Plaintiff's back until he was able to pick up Plaintiff's left hand and move it behind his back. A woman in the crowd grabbed Dunn's taser from him. Sheldon placed handcuffs on Plaintiff. Plaintiff raised his torso until he was upright on his knees. Plaintiff them went from kneeling to standing with assistance from the officers. Plaintiff was able to walk to the substation, and later to the patrol vehicle, without assistance. Hagemeister stated that Plaintiff was being arrested for disorderly conduct. Plaintiff was then escorted to the Aggieville substation.

After speaking with the bouncer for a few seconds, Sheldon turned his attention back outside the bar, where he saw other officers were scuffling with someone and appeared to have

---

[3] Plaintiff contends that he was "rendered unconscious for a brief period of time following his head striking the metal rail and has no recollection of the events that follow." Doc. 46 at 9-10. Plaintiff asserts that his apparent limp right arm can be seen "lifted and flopped on his back." The body camera videos show that Plaintiff immediately gave up his left arm after being threatened with a taser, and show that he clenched and unclenched his left hand while the handcuffs were applied. *See* Doc. 39-11 at 1:03-1:27; Doc. 39-11A.

Plaintiff on the ground. At this point, Hagemeister arrived at the scene. A witness told Hagemeister that the bouncer told Plaintiff to "get the fuck out" and "pushed him out for no reason" and "that's how everything got started." Another witness told Hagemeister that Plaintiff was dancing "towards the door" when the bouncer told Plaintiff "you need to leave" and then pushed Plaintiff. That witness said that she and another woman had calmed Plaintiff down but the bouncer "piped back up" when Plaintiff got back up. A third witness told Hagemeister that Plaintiff was dancing inside the bar and the bouncer said: "That's it. You need to get out."

Sheldon sat and spoke with Plaintiff in the substation. Plaintiff was visibly impaired and appeared to be intoxicated. A crowd began to gather outside the substation. Plaintiff's brother was argumentative and those around him were trying to restrain him. Hagemeister decided to move Plaintiff from the substation to another location as Plaintiff's presence was causing a problem. Plaintiff was escorted in handcuffs by Sheldon and Hagemeister from the substation to a patrol vehicle. While walking to the patrol vehicle, Plaintiff flexed and tried to turn and pull away. The officers told Plaintiff to relax and to stop flexing. Plaintiff replied: "Ain't no fucking relaxing because I ain't did shit."

Hagemeister's right arm was intertwined with Plaintiff's left arm, with Hagemeister's right hand on Plaintiff's left shoulder. Outside the patrol vehicle, the officers realized the handcuffs were not double locked. Hagemeister held Plaintiff still so Sheldon could double lock the handcuffs. Plaintiff began to grab at Hagemeister's uniform sleeve and his hand. Hagemeister grabbed Plaintiff and told him to let go of his hand. After the handcuffs were double locked, Hagemeister began to pull his right arm free. Plaintiff tensed and pulled his upper arms forward locking Hagemeister's arm between Plaintiff's forearm and back, and Plaintiff began to twist his

body towards Hagemeister. Hagemeister shouted, "Let go," and punched Plaintiff once in the ribs.[4] Hagemeister testified that the punch was a reflexive response that served as a distraction technique to prevent injury to himself. Hagemeister instructed Sheldon to arrest Plaintiff for battery on a law enforcement officer.

On June 14, 2018, Plaintiff was charged with interference with law enforcement, obstruction of official duty. The charge was dismissed without prejudice on July 23, 2018. Plaintiff filed this lawsuit against Defendants on July 19, 2019.

## II.     STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

But when a defendant asserts qualified immunity at the summary-judgment stage, the traditional summary-judgment analysis does not apply. *Thomson v. Salt Lake City*, 584 F.3d 1304, 1327 (10th Cir. 2009) (Holmes, J., concurring). Rather, a presumption is raised that the defendant is immune from suit. *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). And the burden shifts to the plaintiff to show: (1) the defendant violated a constitutional right; and (2) the constitutional

---

[4] Plaintiff does not remember being punched and did not have a bruise from it.

right was clearly established at the time of the defendant's conduct. *Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2017) (internal quotations omitted). A court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A right is clearly established when there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority supports the plaintiff's position. *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)). But the "plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (citation and internal quotations omitted). Instead, the court must determine "whether the violative nature of <u>particular</u> conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original).

### III.  ANALYSIS

Plaintiff asserts three claims under 42 U.S.C. § 1983.[5] Plaintiff brings claims for malicious prosecution and excessive force against all Defendants. Plaintiff also brings a claim for negligent supervision against Boeckman and Hagemeister. Defendants seek summary judgment on all of Plaintiff's claims. The Court addresses each in turn.

#### A.  Defendants are entitled to qualified immunity on Plaintiff's claim for malicious prosecution.

##### 1.  Defendants had probable cause to arrest Plaintiff.

Plaintiff asserts this claim against all Defendants, and each Defendant asserts qualified immunity. The Court starts with the first prong, which requires Plaintiff to show a constitutional

---

[5] Plaintiff concedes that he is not asserting any state law claims. Doc. 46 at 29.

7

violation. A plaintiff seeking to recover for malicious prosecution under § 1983 must prove that he was unlawfully arrested by the defendants. *See Petit v. Campbell*, 2018 WL 5084317, at *7-8 (D. Kan. 2018). An unlawful arrest occurs when there is no probable cause to support the arrest. *Id*. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* at *7 (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002)). Probable cause does not demand that there be knowledge or facts sufficient for a finding of guilt, but it requires "more than mere suspicion." *Id*. Under the "fellow officer" rule, probable cause is determined based on the collective information of the officers involved in the arrest. *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985).

Here, Plaintiff cannot establish that Defendants violated his constitutional right, i.e., that he was arrested without probable cause. Sheldon approached first. When Sheldon's attention was drawn to Tate's, Plaintiff was on all fours on the ground. Plaintiff was surrounded by many people who were yelling and screaming. Sheldon assumed Plaintiff was on the ground because of a fight. The bouncer was screaming at Plaintiff to "get out," and the women around Plaintiff were telling him to "get up" and "let's go." Indeed, everyone around Plaintiff appeared to agree that Plaintiff needed to leave the bar immediately. Moreover, when Plaintiff and his group were leaving, Plaintiff turned around and retreated back into the bar. This prompted the bouncer to again yell at Plaintiff to get out and caused Plaintiff's brother and Sheldon to enter the bar and get in between Plaintiff and the bouncer. Plaintiff's brother had to bear hug Plaintiff and force him towards the exit again. Based on these uncontroverted facts, it was reasonable for Sheldon to believe that Plaintiff had engaged in conduct that had alarmed, angered, or disturbed others. *See* K.S.A. § 21-

8

6203(a).[6] Thus, Sheldon had probable cause to arrest Plaintiff for disorderly conduct, and no reasonable jury could conclude otherwise.

McDiffett also had probable cause to arrest Plaintiff for disorderly conduct. McDiffett responded to Sheldon's report of a fight in Tate's. As he approached, McDiffett observed Sheldon standing at the front doorway appearing to converse with some people. McDiffett then saw Sheldon go into the bar. Almost immediately thereafter, McDiffett observed a struggle in the doorway, so he approached and entered the bar. Upon entering, McDiffett saw Plaintiff struggling with some people who were trying to remove Plaintiff from the bar. McDiffett heard the bouncer yelling repeatedly for Plaintiff to get out. Based on these uncontroverted facts, it was reasonable for Sheldon to believe that Plaintiff had engaged in conduct that had alarmed, angered, or disturbed others. *See* K.S.A. § 21-6203(a). Thus, every reasonable juror would find that McDiffett had probable cause to arrest Plaintiff for disorderly conduct.[7]

McDiffett then attempted to grab Plaintiff's arm to bring him under control. McDiffett identified himself as a police officer and told Plaintiff to put his arms behind his back. Boeckman and Dunn arrived at the same time, as McDiffett was struggling with Plaintiff. Boeckman saw Plaintiff struggling with McDiffett and trying to get back into Tate's. This led Boeckman to believe, in connection with the fight call, that McDiffett was trying to restrain or detain Plaintiff. Boeckman saw Plaintiff being disorderly with McDiffett and refusing efforts to restrain him. Boeckman saw that Plaintiff was agitated, acting in an aggressive manner, and causing a scene. Boeckman also saw Plaintiff pull McDiffett into the bar, causing Boeckman concern for

---

[6] In Kansas, disorderly conduct encompasses acts that the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace. K.S.A. § 21-6203(a)(1)-(3) (emphasis added). This includes but is not limited to: brawling or fighting; disturbing a lawful assembly, meeting, or procession; and using fighting words or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others. *Id.*

[7] At the very least, reasonable suspicion existed to stop and detain Plaintiff for investigative purposes. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989).

McDiffett's safety. Similarly, Dunn saw McDiffett trying to remove Plaintiff from the bar. Dunn heard McDiffett giving commands to Plaintiff to stop resisting and saw that Plaintiff was not complying and was actively resisting. McDiffett, Boeckman, and Dunn gave multiple commands for Plaintiff to put his arms behind his back, but Plaintiff refused every command.[8] Based on these uncontroverted facts, every reasonable juror would conclude that it was reasonable for McDiffett, Boeckman, and Dunn to believe that Plaintiff was committing the offense of interference with law enforcement, which includes "knowingly obstructing, resisting, or opposing [a law enforcement officer] . . . in the discharge of any official duty." K.S.A. § 21-5904(a)(3).

The factual dispute regarding whether Plaintiff was the aggressor or the victim of an overzealous bouncer is irrelevant. What matters is whether the "facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Petit*, 2018 WL 5084317, at *7. And here, the uncontroverted facts and circumstances that Sheldon, McDiffett, Boeckman, and Dunn observed were sufficient to lead them to believe Plaintiff had committed or was committing the offenses of disorderly conduct and interference with law enforcement. No reasonable jury could conclude otherwise.

Finally, Sheldon and Hagemeister had probable cause to arrest Plaintiff for battery on a law enforcement officer while escorting Plaintiff to the patrol vehicle. When Plaintiff was told to relax and stop flexing, Plaintiff replied "Ain't no fucking relaxing because I ain't did shit." While attempting to double lock the handcuffs, Plaintiff grabbed at Hagemeister's sleeve and grabbed his hand. After Plaintiffs' handcuffs were double locked, Hagemeister began to pull his right arm free

---

[8] Plaintiff admits he did not comply with the repeated commands of identified police officers to stop resisting and to place his hands behind his back. Plaintiff further admits that he resisted Defendants' efforts to detain him. *See* Doc. 39 ¶¶ 93-94; Doc. 46 ¶¶ 93-94.

from Plaintiff's arms. Plaintiff admits he tensed and pulled his upper arms forwards locking Hagemeister's arm between Plaintiff's forearm and back and began to twist his body towards Hagemeister. *See* Doc. 39 ¶¶ 137-46; Doc. 46 ¶¶ 137-46. These facts establish that Plaintiff knowingly caused physical contact with a law enforcement officer in a rude, insulting or angry manner. *See* K.S.A. § 21-5413(a)(2), (c)(1)(B). Thus, every reasonable juror would conclude that Sheldon and Hagemeister had probable cause to arrest Plaintiff for battery on a law enforcement officer.

In sum, Plaintiff has failed to set forth facts by which a reasonable jury could find that Defendants lacked probable cause to arrest. Because Plaintiff cannot establish a constitutional violation occurred, Defendants are entitled to qualified immunity on Plaintiff's claim for malicious prosecution. *See Holmes v. Town of Silver City*, 2020 WL 5085843, at *2-3 (10th Cir. 2020) (holding that probable cause to arrest for obstruction warranted summary judgment on false arrest and malicious prosecution claims).

### 2. Defendants had arguable probable cause to arrest Plaintiff.

Even if Plaintiff could establish that he was arrested without probable cause, Defendants are entitled to qualified immunity under the second prong because Plaintiff cannot establish the constitutional right was clearly established in the factual context of this case. A court ascertains whether a defendant violated clearly established law by asking whether there was "arguable probable cause" for the challenged conduct. *See Culver v. Armstrong*, 832 F.3d 1213, 1218 (10th Cir. 2016) (internal quotation omitted). "Arguable probable cause is another way of saying that the officers' conclusions rest on an <u>objectively reasonable</u>, even if mistaken, belief that probable cause exists." *Id.* (emphasis in original). A defendant is entitled to qualified immunity if a

11

reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff. *Id*.

Plaintiff generally argues that "[t]he law is clearly established that a warrantless arrest that is not supported by probable cause violates the Fourth [A]mendment." Doc. 46 at 21 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Plaintiff also argues that Defendants learned information that destroyed their probable cause to arrest, rendering the arrest unlawful. *See* Doc. 46 at 23 (citing *United States v. Valenzuela*, 365 F.3d 892, 902 (10th Cir. 2004)). Plaintiff misunderstands the nature of the qualified immunity inquiry. Plaintiff's arguments cast "way too high a level of generality over" the Court's inquiry. *Culver*, 832 F.3d at 1218. Rather, "[t]he dispositive question is whether the violative nature of <u>particular</u> conduct is clearly established." *Mullenix*, 577 U.S. at 12 (emphasis in original). This inquiry must be undertaken in the specific context of this case, not as a broad general proposition. *Id*. Thus, to withstand Defendants' qualified immunity defense, Plaintiff must show that the unlawfulness of Defendants' conduct was clearly established or apparent "in the light of pre-existing law." *Hope v. Pelzer*, 536 U.S. 739, 739 (2002).

Here, the Court concludes Plaintiff has not met his burden to overcome the clearly established prong of the qualified immunity analysis. Plaintiff has not identified any sufficiently analogous case law showing no reasonably competent officer could have concluded probable cause existed under the facts presented here. *See Quinn v. Young*, 780 F.3d 998, 1007-09 (10th Cir. 2015) (granting qualified immunity where the plaintiff failed to direct the court to "any clearly established law involving such sting operations or an analogous law-enforcement setting" and holding the officers "would not have had fair warning" that their arrests were lacking in probable cause).

Plaintiff's argument that probable cause was destroyed upon Defendants' investigation is not persuasive. Plaintiff only argues that Defendants knew or should have known Plaintiff was not the aggressor, and Defendants were therefore mistaken in their belief that Plaintiff had committed the offense of disorderly conduct. But Plaintiff fails to address the fact that Defendants had probable cause to arrest Plaintiff for interference with law enforcement. At the very least, Sheldon and McDiffett were justified in performing a *Terry* stop to investigate the cause of the disturbance. Plaintiff, however, refused to comply with—and actively resisted—the lawful commands of McDiffett, Boeckman, and Dunn after identifying themselves as police officers. An officer can be mistaken about the original basis for arrest, but the arrest is constitutional so long as probable cause exists for at least one crime. *See Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004). And here, probable cause existed to arrest Plaintiff for interference with law enforcement—and later battery on a law enforcement officer—for the same reasons set forth above.

Neither the plain language of the Kansas statutes nor Kansas, Tenth Circuit, or Supreme Court case law provide notice to a reasonable officer that there was no probable cause to arrest Plaintiff. Accordingly, Defendants are also entitled to qualified immunity under the second prong because Plaintiff has not established the constitutional right was clearly established in the factual context of this case.

### B. Defendants are entitled to qualified immunity on Plaintiff's excessive force claims.

Defendants next contend that excessive force was not used against Plaintiff and that they are entitled to qualified immunity. Plaintiff argues that Defendants used excessive force by "ramming" Plaintiff's head into a metal rail and by continuing to use force once Plaintiff was rendered unconscious. Plaintiff does not argue that Hagemeister's punch to the ribs constituted excessive force.

13

Excessive force is determined under an "objective reasonableness" standard from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). The right of law enforcement to make an arrest or investigatory stop carries with it "the right to use some degree of physical coercion or threat thereof to effect it." *Id*. Relevant factors considered in determining whether force was excessive include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id*. The "calculus of reasonableness" allows for the fact that officers are often forced to make split-second judgments about the force that is necessary in circumstances that are tense, uncertain, and rapidly evolving. *Id*. at 396-97. Ultimately, the inquiry is whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force. *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017).

### 1. The force used by Defendants was objectively reasonable under the *Graham* factors.

Viewed in light of the *Graham* factors—particularly Plaintiff's resistance to arrest and safety concerns—Defendants' conduct in this case was objectively reasonable and no reasonable jury could conclude otherwise. Defendants had reason to believe they were responding to a potentially volatile situation involving a fight or disturbance at a bar. The fact that Plaintiff may have been the victim of an assault by the bouncer is not dispositive. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Defendants had not yet confirmed any of the information regarding Plaintiff's altercation with the bouncer when they decided to detain Plaintiff and remove him from the premises. But they did observe a disturbance involving Plaintiff and observe multiple individuals yelling and screaming at Plaintiff to leave Tate's. Given this,

Defendants had an objectively reasonable basis to believe that Plaintiff had engaged in conduct that had alarmed, angered, or disturbed others. It was only after Plaintiff refused repeated commands of identified police officers to stop resisting and to place his hands behind his back that any force was used. Plaintiff cannot establish that the force used by any of Defendants was objectively unreasonable.

### a.     Sheldon did not use excessive force.

Sheldon first saw Plaintiff on all fours on the ground with several people in the general vicinity, with lots of yelling going on. The bouncer was repeatedly yelling "get out," and some women around Plaintiff were telling him to "get up" and "let's go." Sheldon assumed Plaintiff was on the ground because of a fight. Sheldon radioed-in the matter as a fight to assure a quick response by other officers. When Sheldon went into the bar, he stood between Plaintiff and the bouncer. The bouncer was yelling at Plaintiff and telling him he needed to get out. Sheldon threatened to use pepper spray if Plaintiff did not leave, but Sheldon did not deploy the pepper spray or use any force on Plaintiff. Once outside, while Plaintiff was on the ground, Sheldon placed the handcuffs on Plaintiff. Sheldon also escorted Plaintiff from the substation to the patrol vehicle. Before entering the vehicle, Sheldon double-locked Plaintiff's handcuffs. No reasonable jury could conclude that Sheldon's threat and use of force was objectively unreasonable. Accordingly, Plaintiff cannot establish a constitutional violation, and Sheldon is entitled to qualified immunity under the first prong.

### b.     McDiffett did not use excessive force.

McDiffett observed Plaintiff struggling with some people who were trying to get him out of the bar and heard the bouncer yelling repeatedly for Plaintiff to get out. McDiffett grabbed Plaintiff's arm, attempting to bring him under control. McDiffett identified himself as a police

15

officer and told Plaintiff to put his arms behind his back and stop resisting, but Plaintiff refused to comply. McDiffett grabbed Plaintiff's right arm, struggled with Plaintiff, and tried to pull Plaintiff from the bar. McDiffett attempted, unsuccessfully, to place Plaintiff's arm behind his back. This is the extent of McDiffett's use of force, because Dunn and Boeckman then entered and grabbed Plaintiff from McDiffett. No reasonable jury could conclude that McDiffett's use of force was objectively unreasonable. Accordingly, Plaintiff cannot establish a constitutional violation, and McDiffett is entitled to qualified immunity under the first prong.

### c.   Boeckman did not use excessive force.

Boeckman saw Plaintiff struggling with McDiffett and trying to get back into Tate's. This led Boeckman to believe, in connection with the fight call, that McDiffett was trying to restrain or detain Plaintiff. Boeckman saw Plaintiff being disorderly with McDiffett and refusing efforts to restrain him. Boeckman testified that Plaintiff was "obviously agitated," acting in an "aggressive manner," "causing a scene," and "any reasonable person would believe that he's trying to start a fight." Boeckman also saw Plaintiff pull McDiffett into the bar, causing Boeckman concern for McDiffett's safety. Boeckman then approached and grabbed Plaintiff's right arm. At the same time, Dunn grabbed Plaintiff's left arm. Boeckman applied an arm-bar. Plaintiff, who was intoxicated and struggling with Boeckman and Dunn, fell quickly and unexpectedly. Boeckman was unable to hold him upright and "just went with him." Unfortunately, Plaintiff struck his head on a metal railing as he and Boeckman fell to the ground. However, there are no facts to suggest that this was done intentionally.[9] There are no facts to suggest that Boeckman tripped Plaintiff, or otherwise directed Plaintiff towards the metal railing. And there are no facts that would put

---

[9]  Plaintiff argues in his response that Defendants "rammed" his head into the metal railing. However, Plaintiff fails to controvert Defendants' statement of fact 96. This statement of fact provides that, while Boeckman was applying the arm bar, Plaintiff "fell very quickly and unexpectedly," and as Plaintiff fell, "Boeckman was unable to hold him upright and 'just went with him.'" Doc. 39 ¶ 96; Doc. 46 ¶ 96.

16

Defendants on notice that Plaintiff was unconscious for any perceivable amount of time. Plaintiff was struggling, communicating, and ambulating throughout the entire sequence of events. Once on the ground Boeckman simply held Plaintiff's right arm and put his fist in Plaintiff's back, while Dunn held Plaintiff's left arm, until Sheldon placed the handcuffs on.

No reasonable jury could conclude that Boeckman's use of force was objectively unreasonable. Accordingly, Plaintiff cannot establish a constitutional violation, and Boeckman is entitled to qualified immunity under the first prong.

### d. Dunn did not use excessive force.

Dunn observed McDiffett struggling with Plaintiff and approached. Dunn grabbed Plaintiff's left arm and threatened to deploy his taser, but Dunn did not deploy his taser. Dunn attempted, unsuccessfully, to force Plaintiff's arm behind his back. Boeckman then grabbed Plaintiff's right arm and applied an arm-bar. Dunn let go of Plaintiff's arm before Plaintiff fell to the ground. While Plaintiff was on the ground, Dunn held Plaintiff's left arm until Sheldon placed the handcuffs on. Although Dunn threatened to deploy the taser while Plaintiff was on the ground, he did not deploy the taser. No reasonable jury could conclude that Dunn's threat and use of force was objectively unreasonable. Accordingly, Plaintiff cannot establish a constitutional violation, and Dunn is entitled to qualified immunity under the first prong.

### e. Hagemeister did not use excessive force.

Hagemeister was not involved in the initial arrest of Plaintiff. While later escorting Plaintiff from the substation to the patrol vehicle, Plaintiff tensed and pulled his upper arms forward locking Hagemeister's arm between his forearm and his back and began to twist his body towards Hagemeister. Hagemeister shouted "Let go" and punched Plaintiff once in the ribs. Plaintiff does not remember being punched and did not have a bruise from it. Hagemeister testified that the punch

17

was a reflexive response that served as a distraction technique to prevent injury to himself. Plaintiff does not argue that Hagemeister's conduct violated his constitutional rights. If he had, no reasonable jury could conclude that Hagemeister's conduct was objectively unreasonable. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

### f. Defendants did not use excessive force.

From the time McDiffett first grabbed Plaintiff until Plaintiff was handcuffed took approximately one minute and four seconds. Every reasonable juror would find that Defendants' threats and use of force in the midst of a tense and rapidly-evolving scene at the entry of a bar at closing time was objectively reasonable. *See Mecham v. Frazier*, 500 F.3d 1200, 1204-05 (10th Cir. 2007).

### 2. Defendants' conduct did not violate clearly established law.

Even if Plaintiff could establish that Defendants violated his Fourth Amendment rights, Plaintiff has not established that the constitutional right was clearly established at the time of the Defendants' conduct. Plaintiff only cites *McCoy v. Meyers*, 887 F.3d 1034 (10th Cir. 2018) and *Perea*, 817 F.3d at 1198, to argue that the continued use of force is not justified once a suspect is rendered unconscious. However, these cases are not applicable to the facts of this case. In *McCoy*, the court held that the defendants' use of force after the plaintiff was under control was unreasonable. But there, the officers struck the plaintiff and placed him in a carotid restraint <u>after he had already been rendered unconscious and his hands and feet were bound</u>, which rendered him unconscious a second time. *McCoy*, 887 F.3d at 1038, 1052. Similarly, in *Perea*, the plaintiff was tasered ten times in two minutes. Under the facts of that case, the court held that a reasonable jury

could find that defendants continued to use the taser even "after the point where it could be considered necessary or even debatably reasonable." *Perea*, 817 F.3d at 1203.

Here, however, Defendants threatened to deploy a taser, but never did. Boeckman and Dunn held Plaintiff's arms, and Boeckman held his fist in Plaintiff's back, but only until the handcuffs were secured. Plaintiff was only on the ground for approximately 30 seconds. Defendants' actions are not on par with the level of force used by the defendants in *Perea* or *McCoy*. Moreover, there are no facts by which it could be inferred Defendants were on notice that Plaintiff was unconscious for any perceivable amount of time. Plaintiff was struggling, communicating, and ambulating throughout the entire sequence of events. Once Plaintiff was handcuffed, he was able to sit up, stand, and walk without assistance. Accordingly, Plaintiff has not identified any clearly established law that places the constitutional question in this case beyond debate. No reasonable jury could conclude otherwise.

  **C. Boeckman and Hagemeister are entitled to summary judgment on Plaintiff's claim for negligent supervision.**

Plaintiff's claim against Boeckman and Hagemeister is predicated on a supervisory-liability theory. In a § 1983 lawsuit, supervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy that subjects the plaintiff to the deprivation of constitutional rights. *Brown*, 662 F.3d at 1163-64. A plaintiff arguing for the imposition of supervisory liability must show an "affirmative link" between the supervisor and the constitutional violation. Supervisory liability "must be based upon active unconstitutional behavior." *Serna v. Colo Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). Thus, in order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution. *Id*.

Here, Plaintiff has not shown that any of the Defendants committed unconstitutional acts or violated Plaintiff's constitutional rights. No reasonable jury could conclude otherwise. Accordingly, Boeckman and Hagemeister are entitled to summary judgment on Plaintiff's claim for negligent supervision.

## IV.   CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion for Summary Judgment (Doc. 39) is GRANTED. Judgment is to be entered in favor of Defendants.

IT IS SO ORDERED.

Dated: March 18, 2021                      /s/  *Holly L. Teeter*
                                           HOLLY L. TEETER
                                           UNITED STATES DISTRICT JUDGE